UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | Case No. 23-CR-217 (CJN) |
| v. | : | |
| | : | |
| RENEE FATTA, | : | |
| | : | |
| Defendant. | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Renee Fatta to three years of probation with a condition of 14 days of intermittent confinement, 60 hours of community service, and $500 in restitution.

### I. Introduction

Defendant Renee Fatta, a forty-one-year-old from upstate New York, participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

Fatta pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G). As explained herein, probation with a period of incarceration is appropriate in this case because Fatta: (1) knowingly entered the Capitol building at the Parliamentarian side door, amid signs of the violent breach that were still fresh and obvious; (2) smoked marijuana while inside the Capitol; (3) only left the Capitol building after being forced out by police officers who deployed pepper spray; (4) even after being expelled, she remained on Capitol grounds for an additional thirty minutes as chaos ensued; and (5) in the days after January 6, she failed to appreciate the seriousness of her actions, posting on Parler that "when I see pics of the senate laying on their sea[t]s scared it warms my heart."

The Court must also consider that Fatta's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and disrupt the proceedings. Here, the facts and circumstances of Fatta's crime support a sentence of three years of probation with a condition of 14 days of intermittent confinement.

## II.   Factual and Procedural Background

*The January 6, 2021, Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 1 (Statement of Offense), at 1-2.

*Defendant Fatta's Role in the January 6, 2021 Attack on the Capitol*

Unhappy with the 2020 election results, on January 5, 2021, Fatta and Scott Columbus[2] drove together from New York State to a hotel in Maryland with the intention of attending former

---

[2] Columbus also pleaded guilty to 5104(e)(2)(G), in front of Judge Moss (23-cr-218-RDM) and will be sentenced on January 10, 2024.

2

President Donald Trump's 'Stop the Steal' rally on the Ellipse. On January 6, 2021, Fatta and Columbus attended the rally, where Fatta posed for the photo below:



*Image 1: Fatta, wearing a pink 'TRUMP' hat, posed for a photo at the 'Stop the Steal' Rally*

After the rally, Fatta and Columbus walked to the Capitol grounds where they entered the restricted perimeter on the west side. Fatta and Columbus spent an undetermined amount of time on the West Plaza before ascending to the Upper West Terrace.

3



*Image 2: Still from open source depicting Fatta and Columbus (yellow square) in the crowd that amassed on the West side of the Capitol.*

On the Upper West Terrace, rioters violently kicked in the Parliamentarian door located on the inner north side of the UWT. The door was breached at approximately 2:42 pm. *Ex. 1* at 2:18. Fatta and Columbus entered the Capitol Building through those doors at 2:45 pm. CCTV captures Fatta smiling and appearing to dance as she entered. *Id*. at 5:56-6:06.



*Image 3: Still from Exhibit 1 capturing Fatta's and Columbus' entrance.*

Upon entering, Fatta and Columbus walked into the Parliamentarian's office suite to the immediate right of the doors. Fatta and Columbus spent about twenty seconds in the suite, where they observed other rioters ransacking the private office space. *See* Ex. 2. Despite witnessing up close the destruction wreaked by the rioters, Fatta and Columbus made the decision to not leave through the nearby exit, but to venture further into the Capitol building. Ex. 1 at 6:20-6:6:40.



*Image 4: Exhibit 1 still capturing Fatta and Columbus entering the Parliamentarian's office suite.*

Fatta and Columbus continued walking through the Capitol until they were stopped by a line of MPD officers who were preventing rioters from advancing further. Other rioters yelled "push back!" as they attempted to get around the officers. Fatta can be seen in the group, smiling and waving, with a marijuana vape pen in her hand. *Ex.4* at :49.



*Image 5: Still from Exhibit 4 showing Fatta in the crowd at time stamp :49.*

Fatta and Columbus spent approximately two minutes near the police line and began to exit only once police officers began deploying pepper spray on the crowd. *Ex. 4* at :50-1:15. Fatta and Columbus exited the Capitol building at approximately 2:48 p.m. through the Parliamentarian side door. Ex. 1 at 8:25-9:00.



*Image 6: Exhibit 1 still showing Fatta's exit.*

Despite their expulsion from the Capitol building, Fatta and Columbus spent at least an addition thirty minutes on the Upper West Terrace. See *Ex. 5* at 41:14-48:41.



*Image 7: Still from Exhibit 5 (MPD BWC) showing Fatta and Columbus remaining on Capitol grounds after their expulsion from the building.*



*Image 8: Still from Fatta's Facebook showing a jubilant Fatta on the Upper West Terrace after her expulsion from the Capitol.*

*Fatta's Pre-arrest Interview with the FBI*

On February 2, 2022, investigators interviewed Fatta at her home in Bridgeport, New York. Fatta admitted to traveling to Washington, D.C. with Scott Columbus. Fatta stated both she and Columbus attended the 'Stop the Steal' rally and stayed through the close of the former President's speech. After the rally, Fatta told investigators she overheard numerous people saying they were going to the Capitol grounds, and she and Columbus decided to join. While on the grounds, Fatta described the scene as "chaotic." Fatta admitted that she and Columbus did go inside the Capitol, but she minimized her actions, stating she was pushed inside. Fatta also admitted to smoking marijuana while inside the Capitol and said she left because she felt crowded. Fatta stated that after exiting, she and Columbus stayed on Capitol grounds until the former President tweeted and told people to leave.

*Social Media Posts*

After January 6, 2021, Fatta did not appreciate the gravity of her and other's participation in the riot. In her posting to social media below, Fatta commented that images of scared lawmakers seeking safety from the rioters "warms her heart." She also minimized the destruction the rioters wrought inside the Capitol.



*The Charges and Plea Agreement*

On May 24, 2023, the United States charged Fatta by criminal complaint with violating 18 U.S.C. § 1752(a)(1), 18 U.S.C. § 1752(a)(2), 40 U.S.C. § 5104(e)(2)(D), and 40 U.S.C. § 5104(e)(2)(G). On June 8, 2023, law enforcement officers arrested Fatta in New York. On July 7, 2023, the United States charged Fatta by a four-count Information with violating the above statutes. On July 26, 2023, pursuant to a plea agreement, Fatta pleaded guilty to Count Four of the Information, charging her with a violation of U.S.C. § 5104(e)(2)(G). By plea agreement, Fatta agreed to pay $500 in restitution to the Architect of the Capitol.

### III.     Statutory Penalties

Fatta now faces a sentencing on a single count of violating U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, Fatta faces up to six months of imprisonment and a fine of up to $5,000. Fatta must also pay restitution under the terms of her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.     Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of three years of probation with a condition of 14 days of intermittent confinement, 60 hours of community service, and $500 in restitution.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds

10

of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Fatta's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Fatta, the absence of violent or destructive acts is not a mitigating factor. Had Fatta engaged in such conduct, she would have faced additional criminal charges.

Fatta danced her way into the Capitol shortly after witnessing the Parliamentarian door's violent breach. Once inside, Fatta witnessed destruction, heard other rioters chanting for violence against police, and was still not deterred. Instead, she took out her marijuana vape pen to enjoy the spectacle, and she only left after being pepper sprayed by police. After being expelled from the building, again Fatta was not deterred. She remained on the Upper West Terrace with Columbus, ignoring police officers' requests that she leave, and she only left after the former President directed his supporters to vacate. In the wake of the riot, Fatta minimized and defended the rioters' actions on social media, callously stating that images of lawmakers fearing for their lives "warms [her] heart." Furthermore, when agents interviewed Fatta, she presented a self-serving version of events that has been contradicted by the evidence. Accordingly, the nature and the circumstances of this offense establish the clear need for a significant sentence including three years of probation with a condition of 14 days of intermittent confinement.

B.  **The History and Characteristics of Fatta**

Fatta is absolutely someone who needs policing to follow societal rules. As set forth in the PSR, Renee Fatta's criminal history consists of seven prior misdemeanor convictions spanning from 1998 through 2017. ECF 21 ¶¶ 35-41. Fatta currently has two pending matters from 2018.

One matter is for criminal possession the other is for criminal possession of a controlled substance, unauthorized use of a motor vehicle, and false personation. *Id*. at ¶ 43. Fatta's seven convictions are for:

1. Trespass (1998)
2. Driving While Intoxicated (2005)
3. Possession of a Controlled Substance (2014)
4. Possession of a Controlled Substance (2016)
5. Criminal Use of Drug Paraphernalia (2016)
6. False Personation (2017)
7. Petite Larceny (2017)

Despite two decades of second chances to better herself, Fatta finds herself with a new conviction. Fatta's history of supervision has always been minimal, resulting in new arrests. Fatta's continual lack of respect for the law culminated in inexcusable behavior on January 6, 2021. Fatta voluntarily and joyfully entered the Capitol on January 6, 2021, and disrupted the peaceful transfer of power for the first time in American history. Her public commentary after, celebrating the fear Senators felt, was so brazen it is indicative of someone who is not concerned of consequences because there have never been lasting consequences. A lengthy period of supervision will both serve as both a guide to Fatta and a deterrent to participant in any future criminal behavior.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Cronin*, 22-cr-233 Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America, and that's the peaceful transfer of power.") (statement of Judge Berman-Jackson).

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of this Court at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to

13

convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Fatta expresses no remorse and fails to appreciate the gravity of her conduct on January 6, 2021. Fatta's participation in the attack on the Capitol is one criminal act in a larger pattern of criminal acts. Fatta has a lengthy history of drug abuse. She has clearly not recovered; she admitted to smoking marijuana even during the roughly three minutes she spent inside the Capitol. Fatta's criminal history and drug habit strongly suggest she is likely to reoffend in the future. A 36-month period of probation with a condition of intermittent confinement is necessary to deter Fatta from future wrong-doing.

### E. The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[3] This Court must sentence Fatta based on her own conduct and relevant characteristics, but should give substantial weight to the context of her unlawful conduct: her participation in the January 6 riot.

Fatta has pleaded guilty to Count Four of the Information, charging her in violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the

---

[3] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Michael Orangias*, 21-cr-265 (CKK), Judge Kollar-Kotelly sentenced the defendant to three months of home detention and 36 months' probation after he pled guilty to 40 U.S.C. § 5104(e)(2)(G). Orangias was inside the Capitol building for approximately five minutes, gave an interview to a podcast where he defended his actions and those of his fellow rioters, and twice lied to the FBI by saying he did not enter the building.

In *United States v. Willard Bostic*, 21-cr-643 (CKK), Judge Kollar-Kotelly sentenced the defendant to three months of home detention and 36 months' probation after he pled guilty to 40 U.S.C. § 5104(e)(2)(G). Bostic entered through the Senate Wing Door and was inside the building for four minutes. He showed no remorse for his actions, stating that people should storm the Capitol again.

In *United States v. Chad Heathcote*, 22-cr-232 (CJN), this Court sentenced the defendant to 15 days home confinement as a part of 36 months' probation after he pled guilty to 40 U.S.C. § 5104(e)(2)(G). Similar to Fatta, Heathcote only spent two minutes inside the Capitol and showed a lack of remorse for his action. However, unlike Fatta, Heathcote had no prior criminal history.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

### IV.    Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[4] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering

---

[4] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Fatta must pay $500 in restitution, which reflects in part the role she played in the riot on January 6.[5] Plea Agreement at ¶ 11. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,881,360.20" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of October 14, 2022." *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) Fatta's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 93.

## V. Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Fatta to three years of probation with a condition of 14 days of intermittent confinement, 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on her liberty as a consequence of her behavior.

---

[5] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

        Respectfully submitted,

        MATTHEW M. GRAVES
        United States Attorney
        D.C. Bar No. 481052

By:    /s/ *Rebekah Lederer*
        REBEKAH LEDERER
        Pennsylvania Bar No. 320922
        Assistant United States Attorney
        U.S Attorney's Office for District of Columbia
        601 D St. N.W, Washington, DC 20530
        (202) 252-7012
        Rebekah.Lederer@usdoj.gov